IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA EX. REL.
JAMES BEEKMAN

      Plaintiff,

v.

INDYMAC FEDERAL BANK, F.S.B. F/K/A
INDYMAC BANK, F.S.B., INDYMAC
MORTGAGE SERVICES, a division of ONE
WEST BANK, FSB; ONE WEST BANK,
FSB; FEDERAL HOME LOAN MORTGAGE
CORPORATION GEORGE SAROS

      Defendants.

_____/

**UNDER SEAL**

CASE NO.:  9:12-CV-81138-RSR

FALSE CLAIMS ACT COMPLAINT
PURSUANT TO TITLE 31 CHAPTER 37
SUBCHAPTER III SECTION 3729

## AMENDED RELATOR'S COMPLAINT

1.    I, JAMES G. BEEKMAN, as Relator, suing for himself and the United

States of America, files this Amended Relator's Complaint against the Defendant, ONE

WEST BANK, FSB, now known as ONE WEST BANK, N.A. and would show as

follows:

### I.

### PARTIES

2.    Qui Tam Relator, JAMES G. BEEKMAN, is a citizen of the United States

and resident of the State of Florida, residing in West Palm Beach, Florida.

3.     The United States of America (hereinafter "the Government") through the Federal Deposit Insurance Corporation (FDIC), preserves and promotes public confidence in the U.S. financial system by insuring deposits in banks and thrift institutions for at least $250,000.00.

4.     As a quasi-independent agency of the Federal Government, the FDIC was created in 1933 in response to the thousands of bank failures that occurred in the 1920s and early 1930s.

5.     The FDIC is funded by the premiums that banks and thrift institutions pay for deposit insurance coverage and from earnings on investments in U.S. Treasury securities.  The FDIC insures more than $7 trillion of deposits in U.S. banks and thrifts-deposits in virtually every bank and thrift in the country. In the crash that started in 2007-2009 the FDIC was also funded by the U.S. Treasury department using taxpayer money in order to cover losses that banks claimed to have incurred as a result of mortgage loan defaults (one of which was Defendant One West Bank, FSB).

6.     The FDIC directly examines and supervises more than 4,900 banks and savings banks for operational safety and soundness, more than half of the institutions in the banking system, which included the Defendant, One West Bank, FSB.

7.     Banks can be chartered by the states or by the Federal Government.  Banks chartered by states also have the choice of whether to join the federal reserve system.

8.     The FDIC is the primary federal regulator of banks that are chartered by the states that do not join the Federal Reserve System.  In addition, the FDIC is the back-

2

up supervisor for the remaining insured banks and thrift institutions, including the Defendant, One West Bank, FSB.

9.    The FDIC also examines banks for compliance with consumer protection laws, including the Fair Credit Billing Act, the Fair Credit Reporting Act, the Truth-In Lending Act, and the Fair Debt Collection Practices Act, to name a few.

10.    To protect insured depositors, the FDIC responds immediately when a bank or thrift institution fails.   Institutions generally are closed by their chartering authority – the state regulator, the Office of Comptroller of the Currency, or the Office of Thrift Supervision.   One of those failures was IndyMac on July 11, 2008, the originator of thousands of alleged mortgage loans, two of which were "closed" with the Relator. The FDIC has several options for resolving institution failures, such as selling deposits and loans of the failed institution to another institution.   Customers of the failed institution automatically become customers of the assuming institution.   Most of the time, the transition is seamless from the customer's point of view.

11.    In the case of loans receivable of the failed bank, those are assets carried on the balance sheet of the FDIC as receiver for the failed bank estate. Those are also sold sometimes to the acquiring bank and sometimes to outside parties.  In the case of IndyMac, all assets were transferred to One West.

12.    Virtually none of the mortgage loans originated by IndyMac (and still existing at the time of the IndyMac failure and FDIC receivership), were assets of IndyMac or of the FDIC receivership, to wit: virtually all of the mortgage loans

3

originated by IndyMac were sold into the secondary market, or were funded at inception by third parties in illegal predatory table funded loans (pursuant to Assignment and Assumption Agreements with investment banks in which ownership of the loans was agreed to be the third party conduit for funds before closing with borrowers).

13.     Such Assignment and Assumption agreements created what are commonly called (and defined by Reg Z for the Truth in lending Act) "table funded loans;" such loans were and are contrary to public policy by withholding the name of the actual lender. Withholding disclosure of compensation of undisclosed parties and are "predatory per se" in accordance with the provisions of Regulation Z promulgated by the Federal Reserve as additional authority for the enforcement of consumer protections contained in the Federal truth in Lending Act.  The net result was that the name "IndyMac" appeared on the notes and mortgages as the lender when in fact it was not neither the lender nor the creditor. IndyMac was acting as a conduit or naked nominee in such transactions, including the relator's transactions with IndyMac, as more particularly described below.

14.     Accordingly, by both logic and the terms of agreements with undisclosed third parties, such loans were not or should not have been reported on IndyMac financial statements as loan receivable assets owned by IndyMac. The loans were mostly not carried on the balance sheet of IndyMac as assets (loans receivable) and therefore not carried on the balance sheet of the FDIC as receiver of the IndyMac estate

and accordingly could not have been transferred to One West. However some such loans were reported as loan receivable assets of IndyMac despite the fact that IndyMac had no financial interest in the alleged loans.

15.     The purchase and sale agreement entered into between One West and the FDIC on March 19, 2009 shows that no consideration was paid for the mortgage loans by Defendant, One West Bank, FSB, nor were any actual loans specifically transferred to One West.

16.     Nevertheless, One West then engaged in a pattern of conduct in which it claimed to be the owner of the loans in order to get the benefits of FDIC loss sharing, government guarantees, insurance, and even incentives for modification of mortgage loans in which OneWest posed as the servicer or the owner of the loans that were described on the original notes and mortgages --- reflecting untrue statements regarding the loan transaction and the original loan contract involving thousands of borrowers including the relator as described above. In some cases, OneWest acted in the capacity of servicer in terms of collection of payments from borrowers but the remaining duties of the servicer, including disbursements to creditors was performed by other parties, pursuant to prior agreements. Those disbursements to creditors were made in a manner which created the illusion that the creditors were receiving those disbursements as investors/creditors of a Trust created to comply with the Internal Revenue Code requirements for Real Estate Mortgage Investment Conduits (REMICs); but in fact the disbursements were neither made through or on behalf of the Trusts who in most cases

never purchased the loans nor received the delivery of the loans within the time limits expressed by the Trust documents which mirrored the REMIC provisions of the Internal Revenue Code.

17.     One West Bank, FSB, now known as One West Bank, N.A., is a financial institution that entered into an agreement with the FDIC to take over the failed financial institution IndyMac Bank, and took over the servicing rights of IndyMac Bank, including the deposits and the mortgages of Beekman and other IndyMac Bank customers beginning on or about March 19, 2009 and continuing thereafter.

18.     As part of that agreement, the FDIC entered into a loss-sharing agreement with One West in which 80% of all losses from mortgage defaults would be paid by the FDIC using largely taxpayer money to fund the FDIC so it could pay out these claimed losses which were false when submitted, because One West Bank, FSB was not the owner of or holder of, the notes and had no legal right to foreclosure judgment on behalf of an actual owner of the debt, creditor or lender.

19.     Further, as more specifically described below, other programs were in place in which the mortgages of thousands of people, including the two Relator mortgages referenced above, provided for US Government incentive and guarantee payments to cover losses incurred by the owner of the mortgage and to encourage settlements and modifications requested by thousands of borrowers, including Relator. Guarantee payments were made to One West from Fannie Mae and Freddie Mac covering losses claimed by One West to have been incurred on thousands of loans

including at least one such mortgage loan referred to above that involved the relator. Fannie Mae and Freddie Mac were initially Government Sponsored Entities (GSEs) with backing from the U.S. Government but were quickly nationalized in the financial crisis that began in 2007. The former GSEs are now owned by the US Government.

20.     The losses claimed by One West were untrue, as One West neither owned the mortgage loans on which they received loss sharing, nor were they a creditor or representative of an actual creditor authorized to receive such payments.  None of these facts --- regarding the source of money, ownership of the mortgage loans, nor the absence of any risk of loss --- were known to the FDIC or any of the other United States Government departments and agencies that paid on false claims by One West at the time of payment for nonexistent losses claimed by One West. The true facts were withheld intentionally by One West who was shielded by a complex, convoluted scheme of what was called "securitization" of mortgage loans. Said "Securitization" was a false cloak for a fraudulent scheme in which multiple parties were co-venturers including but not limited to the Defendant One West.

21.     Through his experience with the loan originations involving IndyMac in the fall of 2006, and subsequent foreclosure actions (one filed in the name of IndyMac and one filed in the name of Federal Home Loan Mortgage Corporation (Fannie Mae and Freddie Mac), and through his knowledge as a shareholder (holding 10,000 shares of common stock) with IndyMac and having had extensive conversations with IndyMac shareholder relations and representatives of IndyMac that took place in the beginning

7

of 2008 and continued the sale of FDIC IndyMac receivership assets to OneWest, and through exhaustive investigation and research, Relator analyzed and processed the information he received and collected and arrived at the conclusion that the payments to One West were based upon false claims of ownership, false claims of representation, false claims of loss and risk of loss, and false claims of incurred losses that never existed, some of which were claimed before the loss could have been realized. It was relator who was told that the FDIC payments were partially shielded by "insurance" payments from banks regulated by FDIC and that the remainder of the payments came from the US Government treasury.

22.     Even the FDIC, which claimed it had performed an audit in or about April 1, 2011 to September 30, 2011, examined the wrong data and information and remains mostly in the dark about the true nature of these false claims and payments to One West. Were it not for the research, analysis, and personal experience of the Relator, these claims would never have been revealed.

## II.

## JURISDICTION AND VENUE

23.   This is an action to recover damages and civil penalties on behalf of the Government arising out of false claims and records presented by Defendant, One West Bank to the U.S. Government.  This action arises under the False Claims Act ("FCA"), 31 U.S.C. §3729 et seq., which provides that the United States District Courts shall have exclusive jurisdiction.

24.  This Court also has jurisdiction under 28 U.S.C. §§1331 and 1345.

25.  Jurisdiction is also proper under 31 U.S.C. §330(e)(4) as Relator is the original source of the information assembled for this Amended Complaint, unless noted otherwise, meaning that Relator is an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.  Relator's knowledge of Defendant's practices and actions were gained by his own efforts as a mortgage holder of mortgages that were written, for which the servicing rights may have been taken over by, Defendant and its affiliates and by his status and access to information as a shareholder of IndyMac and by his independent research and analysis, comparing published financial statements of IndyMac, FDIC IndyMac receivership and OneWest to later reports of the actual facts and corroborating that information with the content of telephone conversations he had with IndyMac representatives.

26.  Relator has standing to bring this qui tam action under the FCA, even if Relator has suffered no injury, but in this case Relator has suffered significant past and continuing injury to due to the acts of Defendant and the fraud complained of.  Relator has stepped in as the Government representative or assignee to effectuate that statute's purpose of discovering fraud against the Government.   31 U.S.C. §3730 (b-d).

## III.

## CONDITION PRECEDENT

27.   As required under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §3730(a)(2), Relator provided to the United States Attorney and the Department of Justice, prior to the filing of the original complaint, a statement of all material evidence and information related to the Complaint.

## IV.

## APPLICABLE LAW AND REGULATIONS

**A.    THE FALSE CLAIMS ACT**

28.  The FCA provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; …or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

10

\* \* \*

29. is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person…

30.   (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof or specific intent to defraud is required.

**B.   THE FDIC, ONE WEST BANK, FSB, NOW KNOWN AS ONE WEST BANK, N.A. LOSS SHARING AGREEMENT, FALSE CLAIMS, AND RELATORS INJURY**

31.   The receivership of IndyMac and the FDIC's subsequent sale of IndyMac assets to the Defendant, One West Bank, FSB, now known as One West Bank, N.A., created the opportunity for One West to make false claims to be submitted through the FDIC.  One West received an illegal windfall benefit from its "loss sharing agreement" with the FDIC.  By creating the illusion of a large risk of loss, One West obtained a promise from the FDIC whereby after One West, shouldering the first 20% of any losses, the FDIC pays out the remaining 80% to One West Bank, FSB. Under the loss sharing agreement, One West Bank is only paying 20% of any loss and can then buy the

property at a foreclosure sale through a credit bid and reap 100% of the profits, 100% of the guarantee payment, and even pursue a false deficiency judgment.

32.     One West casts itself as eligible to receive guarantee payments, and did receive guarantee payments from Fannie Mae and Freddie Mac before, during and after the financial crisis and continuing through the date the original complaint was filed, for nonexistent losses in which the FDIC had already paid 80% of the losses that OneWest claimed to have incurred in its false claims to the FDIC and its false claims to the government guarantee agencies.

33.     One West, along with other "pretender lenders," has falsely asserted its right to collect such payments regardless of the facts, because it participated in an emergency (government sanctioned) scheme to save the financial system.  Disturbingly, this implausible response is not uncharacteristic of lenders who exploit FDIC loss-share agreements by seeking to foreclose on nonperforming loans, even when prudent business judgment calls for short sale or loan modification solutions.

34.     In the alternative, One West claims that it was entitled to receive such payments as the servicer for the loans; however, its rights as servicer are wholly dependent upon whether it is representing the owner of the alleged loan or the creditor. The loss sharing agreement was not intended to provide a windfall of profits to One West. It only applied to the Portfolio Loans being purchased.  It did not apply to servicing rights.

35.     First mortgage loans were purchased for 70% of the original balance. Second mortgage loans were purchased at a much lower rate, at 55% or lower at times. But virtually all of the loans allegedly subject to the purchase and sale of the estate of IndyMac from FDIC as receiver, involved loans that IndyMac neither owned nor had actually been retained to serve as servicer of the loan, because the entities that were falsely claiming ownership based the existence of instruments that presupposed that the loans were owned by IndyMac and then transferred or sold by IndyMac into such entities BEFORE the sale to OneWest.

36.     Since the loans were sourced or sold by IndyMac, the result was that IndyMac did not own the loans. Thus, claims of succession to IndyMac by parties other than the parties who actually funded the sale or acquisition of the loan, were false; yet those are the parties falsely claimed by One West to be authorizing One West to act as servicer for the loans, including the two loans involving the Relator/Plaintiff.

37.     IndyMac misrepresented to regulators and shareholders that it owned a large portfolio of Neg Am loans, so the 70% purchase price of individual loans might be "lower" if the loan had accrued a Neg Am balance above the original loan amount. If there were a large number of 30 year fully amortized loans, then there might be a greater than 70% purchase price.  There is no present way to break down the proportion of each because the actual information is closely guarded, denied and withheld by OneWest, IndyMac representatives, and the FDIC receiver over the IndyMac estate.

a.      The first 20% of losses on the "Total Portfolio" purchase would be absorbed by One West Bank.  There would be no reimbursement on those losses.

b.      The next 10% of loses, up to 30%, are reimbursed at 80%.  So to begin to make claims, the 20% level must be reached.

c.      From 30% on, the reimbursement rate is 95%.  But the 30% loss level must be reached before the 95% can be claimed.

d.      The total purchase of Portfolio loans was approximately $12.5 billion, so a 20% loss would be $2.5 billion before claims could begin. Relator has received reports that the entire purchase price was never paid but was rather offset by One West claims for loss sharing payments.

e.      If every single loan (first mortgage) had defaulted on the first day of purchase, and after reimbursement, the agreement, every $.70 spent would have resulted in $7.45 being returned. Thus on the day that One West acquired IndyMac assets, it was also "inheriting" a guaranteed return of more than the purchase price for the acquisition of IndyMac assets from the FDIC receiver based upon false claims of losses incurred by One West that never existed.

38.     It was in the best interests of One West Bank to foreclose on defaulted properties.  Foreclosure Judgment legitimatized and maximized "loss" (as claimed by OneWest) once the 20% loss is reached, then it can make a claim for reimbursement from the FDIC. One West has never reported nor sustained such an economic loss, except to FDIC.  Instead, OneWest claimed actual ownership over a huge (and false)

14

"portfolio" of loans on which it barely had any colorable right to claim servicing rights, and never paid value, much less face value.  But face value was what was used to compute the alleged loss claimed by OneWest. Hence the loss sharing agreement in the case of the relator's loan, guaranteed payment of approximately $220,000 on what was initially a $100,000 loan that was worth 10% of the face value for which OneWest paid virtually nothing or even less than nothing. By then foreclosing, OneWest also pursued title to the property and guarantee payments from the GSE's referred to above, as though there were no loss sharing agreement or payment. Relator realized this because he had two foreclosure cases on what is essentially one piece of land now under unity of title. One case was filed with IndyMac as Plaintiff and remained so despite the dissolution of IndyMac; the other case was brought by the Federal Home Loan Mortgage Corporation (parent to Fannie Mae and Freddie Mac). By comparing the demands in each case he was able to piece together the basic elements of the OneWest scheme to get multiple payments on the same debt claiming nonexistent losses to the detriment of not only the US Government but also the parties who actually lost money.

39.     Relator suspected that OneWest was claiming losses that didn't exist for anyone and that OneWest was receiving those payments from FDIC who was using US Government funds from taxpayers to pay the fictitious claims. In February, 2010, Relator found a person with personal knowledge that claimed to have seen the paperwork on one loan showing that FDIC reimbursement had occurred before there was any loss in a liquidated amount on that loan and this information was not public

but only disclosed to Relator. Relator then started to formulate his conclusion that, together with the information he obtained in the dealings with IndyMac where he had invested as a stockholder $100,000.00, this purchase by One West Bank, FSB was the vehicle by which it could make claims for non-existent losses on loans it did not own.

40.    Based on Relator's analysis, there are several ways where the loss share agreement is being exploited fraudulently and resulting in excessive fraudulent claims. One, is that the participating banks --- including One West (who are claiming and receiving incentive payments for modification) are not complying with the Home Affordability Modification Program (HAMP), even though adhering to HAMP is a precondition to be paid through the shared loss agreement. This was discovered by Relator when he did everything he could to accept the offer made by IndyMac. The circuit judge found that they did offer a permanent modification, but One West insisted that Federal Home Loan Mortgage Corporation did not want it enforced.

41.    Whether FHLMC actually knows that attorneys purporting to represent this government agency (previously a government sponsored agency) have proffered a position that the "lender" would rather have a foreclosure than the money obtained through an agreed, approved, modification, is unknown. What is known, is that by going to foreclosure, One West benefited by making claims for loss share payments from FDIC, guarantee payments from the GSEs, payments on claims under insurance, and receiving proceeds from the foreclosures themselves, of which Relator was one such victim.

16

## C.  RELATOR'S PERSONAL KNOWLEDGE AND THE SCHEMES UNDERLYING THE FALSE CLAIMS ON THE GOVERNMENT

42.  Relator, James Beekman, is a homeowner who lives in West Palm Beach, Florida and had been trying to negotiate a mortgage modification through IndyMac Bank and now through One West Bank, who bought IndyMac from the FDIC.

43.  Relator has been forced to work only with One West and communicate only with One West, since the actual identity of the real parties in interest has been intentionally withheld and he has been stonewalled when he attempted to obtain the information through legal process and inquiries.  As a result, One West has been at least partially successful in thousands of cases, including both foreclosure cases with Relator, in forcing borrowers into foreclosure or luring them into foreclosure by making false claims of promised modifications if the homeowner stops paying for three months.

44.  OneWest continues to use the name IndyMac and Federal Home Loan Mortgage Corporation to shield itself and conceal itself as the primary actor in thousands of foreclosures, past and present, and numerous loans that include borrowers who are "current" on the payments required by the void notes and mortgages. OneWest has engaged in a pattern of conduct in which it frequently maintains foreclosure actions in the names of parties who either have no interest in the cases or who do not even exist. The foreclosing parties do not have an enforceable lien due to not being valid note holders, and not having a valid lien on the property, nor any legal rights to enforce the note.

45.     The fraudulent purported transfer of loans to One West was enhanced through illegal backdating of documents that is still being contested in hundreds of pending cases including Relator's "foreclosures.".   The transfer of the backdated mortgages has been contested successfully in many cases across the country as revelations regarding fabrication of original documents, transfer documents, forgery, perjury, and robo-signing without authority, have come to light.

46.     The reason for fabricating such documents are clear: there is no valid transaction underlying the mortgage loan documents that were presented to borrowers at closing or that are presented to the Court as assignments and endorsements creating the illusion of the purchase and sale of the loans --- transactions that never existed.

47.     One West received loss sharing payments and other third party payments before or during its pursuit of collection or enforcement of the fraudulent loan documents. These receipts were not revealed to either the borrower or the courts while One West was pursuing foreclosure.

48.     The net result is that One West received loss share payments, guarantee payments, servicer incentives, insurance and the proceeds of foreclosure, thus receiving an amount far in excess of even the most generous amount allegedly owed to anyone under the terms of the loans given to Relator and thousands of other homeowners. In other words, even if one were accept that the amount demanded was due, One West received payments that were geometrically larger than the amount even OneWest claimed was due --- thus effecting multiple sales of the debt and receiving more than

100% of the amount due --- an obvious anomaly that is particularly important as it related to the FDIC loss sharing arrangements, and the government guarantee payments.

49.     If the FDIC or FHLMC knew of these receipts, the payment to One West would have been correspondingly reduced or eliminated and accordingly the balance is owed back to the US Government through FDIC and other agencies.

50.     The mortgages were fraudulently assigned, back dated, and robo-signed by Erica Johnson-Seck, and these acts were admitted to in a deposition by the Defendant banks' attorney.  Seck's wrongdoing included assuming many different fictitious titles as the attorney-in-fact and wrongfully claiming personal knowledge. Under sworn testimony, Seck admitted that IndyMac Federal Bank was no longer in existence as of March 19, 2009 yet she signed Beekman's assignment of mortgages from IndyMac Federal to One West Bank on April 19, 2010 – more than one year after IndyMac Bank ceased to exist.  Relator disclosed this information to the U.S. Attorney which was discovered by Relator in defending the foreclosure of both properties.

51.     Once the banks, such as One West, foreclose, they could get a loss share payout, collect on the mortgage insurance, and then buy the house back at the foreclosure at a deep discount, which they did to Relator Beekman.  One West bought his real property for $33,000 when they appraised the property for over $150,000 for forced insurance placement services, all to inflate and drive up the final judgment amount to claim a larger loss.  This inflation of the fictitious loss resulted in payments

from US Government agencies using taxpayer funds to cover those losses at either a percentage (FDIC loss sharing), or fully (GSE guarantees and insurance).

52.     All the while, from 2008 to 2012, Relator had a business and could afford to make the monthly mortgage payments pursuant to the terms of the mortgage documents.  When the bank did discuss a mortgage modification, the terms proposed for Relator to accept a mortgage balance for approximately $300,000 for a property that is likely worth about $80,000 at most.  The $300,000 figure is arrived at after adding fees, penalties, attorneys fees, court costs and other charges that are added to the loan which was added due to the misrepresentations, lies and fraudulent acts of the bank that told him to default in the first place to get help, and then act like it is offering a way out by trying to get the homeowner to accept a bad deal, or one it knew would fail, and cause the foreclosure to be completed.

53.     Were it not for the egregious behavior of OneWest whose business plan was to maximize the apparent "losses" for purposes of collection of loss share, guarantee and other payments, the actual losses to the actual creditors would have been minimized along with the proportional reduction of payments from taxpayer money to cover these manufactured losses.

## "DAMAGES" TO UNITED STATES

54.     At all times relevant to the Amended Complaint, One West certified to the Government that it had complied with all federal laws and statutes.  That certification was false because One West had not complied with all federal laws and statutes.  One

West had in fact violated federal laws and statutes, including the HAMP, and the FDIC One West Bank Loss Share Agreement through the fraudulent schemes and acts described above, and billing the Government, banks, taxpayers, bank depositors and other people through the FDIC. False statements were made by the bankers to obtain payments from the Government, and accepting payments from the Government for the false claims.

55.    Many of the Loss Share claims presented by One West Bank after March, 2009, were supported by the false and fraudulent certifications alleged above, which the Defendant, under law, was not entitled to collect from the Government. Many Loss Share Agreement payouts, which Defendant did in fact collect from the Government, were supported by the submission of false reports and certifications and were unlawfully collected as the result of the false statements and illegal acts alleged above. The Government through the FDIC, homeowners and the people of this country were damaged by the payment of such claims in an amount equal to the total amount of such payments. The United States has additionally been damaged to the extent of the cost of its investigations into the conduct of Defendant.

56.    In addition, the United States is entitled to recover a penalty of not less than $5,500.00 nor more than $11,000.00 for each Loss Share claim supported by the submission of such false certifications.

## WILLFUL AND INTENTIONAL CONDUCT

57.     Relator alleges, on information and belief, that One West Bank and its affiliates' conduct, as alleged above, was willfully and intentionally in violation of 42 U.S.C. §130a-7b(b), of 42 U.S.C. §1295nn, and in "knowing" violation of the False Claims Act 31 U.S.C. §3729.  Defendant has been consciously aware of the statutes in question at all times material hereto.  Defendant has made a conscious decision to engage in the practices alleged above with a conscious awareness that many of the practices in question were illegal under federal and state law.

58.     One West Bank increased its profits substantially due to making false Loss Share claims and claims for payment under guarantees, insurance and servicer incentives.

59.     Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including Loss Share claims and claims based upon losses in liquidation of properties for which it received guarantee payments from Fannie Mae and Freddie Mac. Those payments should not have been demanded by OneWest and should not have been made.

60.     By virtue of the false or fraudulent claims made by Defendant, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

61.     Defendant knowingly made, used, or caused to be made or used, false records or statements – i.e., the false express or implied certification of compliance and representations made or caused to be made by Defendant when initially submitting the false claims for interim payments, and the false certifications made or caused to be made by Defendant in submitting the Loss Share claims – to get false fraudulent claims paid or approved by the Government.

62.     By presenting the false records or false statements made by the Defendants, the Government suffered damages by paying on an obligation it was not obligated to pay, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

63.     Defendant knowingly made, used, or caused to be made or used, false records or statements – i.e., the false express or implied False Claims made or caused to be made by Defendant when initially submitting the Shared Loss claims for payments and the false certifications made or caused to be made by Defendant in submitting the claims for losses to the Government.

64.     Realtor estimates that the total recoverable losses to the U.S. Government to be far in excess of $10 Billion.

65.     As a result of the pattern of business conduct of the Defendant One West, Relator has been obliged to seek the services of counsel and has obligated himself thereto and demands recovery of reasonable attorney fees, costs of this action and related expenses.

23

WHEREFORE,  Relator asks that this Court take jurisdiction over the parties and the subject matter and enter a judgment for damages, equitable relief, attorneys fees, costs, expenses, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Relator, JAMES BEEKMAN, demand trial by jury of all issues so triable.

Dated:      **01/22/15**

*Counsel for Plaintiff:*

By:     /s/ Patrick B. Giunta
Patrick B. Giunta (Bar# 0650528)
Patrick Giunta, P.A.
6451 N. Federal Highway #1202
Ft. Lauderdale, FL 33308
Phone: (954) 928-0100
Facsimile: (954) 928-0107
Primary E-Mail: pbg@pgpalaw.com
Primary E-Mail: jad@pbpalaw.com
*Co-Counsel for Plaintiff*

By:     /s/ Neil F. Garfield
Neil F. Garfield (Bar #229318)
The Garfield Firm
4613 North University Drive
Coral Springs, Florida  33067
Telephone:  (954) 494-6000
Primary E-Mail: neilfgarfield@gmail.com